**Opinion issued December 11, 2025**



In The

# Court of Appeals

For The

# First District of Texas

———————————

**NO. 01-25-00518-CV**

———————————

## IN THE INTEREST OF A.D. A/K/A A.V. A/K/A A.M.V., A CHILD

———————————

**On Appeal from the 505th District Court**
**Fort Bend County, Texas**
**Trial Court Case No. 24-DCV-313210**

———————————

### MEMORANDUM OPINION

In this accelerated appeal,[1] appellant, mother, challenges the trial court's

order, entered after a bench trial, terminating her parental rights to her minor child,

A.D., also known as A.V., also known as A.M.V. ("A.D."), and awarding appellee,

the Department of Family and Protective Services ("DFPS"), sole managing

---

[1]    *See* TEX. FAM. CODE ANN. § 263.405(a); TEX. R. APP. P. 28.4.

conservatorship of A.D.[2] In five issues, mother contends that the trial court erred in not appointing her as a possessory conservator of A.D., with supervised visitation rights, and the evidence is legally and factually insufficient to support the trial court's findings that she knowingly placed, or knowingly allowed A.D. to remain, in conditions or surroundings which endangered his physical or emotional well-being,[3] she engaged, or knowingly placed A.D. with persons who engaged, in conduct that endangered his physical or emotional well-being,[4] she constructively abandoned A.D., who had been placed in the permanent or temporary conservatorship of DFPS for not less than six months,[5] she failed to comply with a court order that specifically established the actions necessary for her to obtain the

---

[2]     The trial court also terminated the parental rights of A.D.'s father, but he is not a party to this appeal.

[3]     *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D).

[4]     *See id.* § 161.001(b)(1)(E).

[5]     *See id.* § 161.001(b)(1)(N).

return of A.D.,[6] and termination of her parental rights was in the best interest of A.D.[7]

We affirm.

## Background

DFPS filed a petition seeking termination of mother's parental rights to A.D. and managing conservatorship of A.D.[8]

### *DFPS Caseworker McKnight*

DFPS caseworker Alicia McKnight testified that she was a Family Based Safety Services ("FBSS") caseworker and mother initially was a part of the FBSS program in 2024.[9] However, mother was not cooperative, and she did not complete

---

[6]    *See id.* § 161.001(b)(1)(O). We note that the Texas Legislature amended Texas Family Code section 161.001(b)(1) and repealed subsection (O), effective September 1, 2025. *See* Act of May 16, 2025, 89th Leg., R.S., ch. 211, § 2, 4, 2025 Tex. Sess. Law Serv. 573, 574–75; *In re D.M.*, No. 11-25-00102-CV, 2025 WL 2980658, at *1 n.2 (Tex. App.—Eastland Oct. 23, 2025, no pet.) (mem. op.). This change only applies to suits affecting the parent-child relationship that were pending on or after the effective date. *See In re D.M.*, 2025 WL 2980658, at *1 n.2. Any reference to Texas Family Code section 161.001(b)(1)(O) in this memorandum opinion is to the previous version of the statute that was in effect at the time the trial court signed its order terminating mother's parental rights to A.D.

[7]    *See* TEX. FAM. CODE ANN. § 161.001(b)(2).

[8]    A.D. was born in July 2022. He was almost three years old when mother's parental rights were terminated.

[9]    *See In re D.C.*, No. 05-19-01217-CV, 2020 WL 1042692, at *1 (Tex. App.—Dallas Mar. 4, 2020, pet. denied) (mem. op.) ("Family based safety services is a [Child Protective Services] program that works with parents to try to keep children in the home."); *Washington v. State*, No. 10-13-00139-CR, 2014 WL 3556525, at *2 (Tex. App.—Waco July 17, 2014, no pet.) (mem. op., not designated for publication) (FBSS is "a program that works with families . . . to provide the services and

3

the required services. While mother was participating in the FBSS program, A.D. was placed outside of her care by agreement.

McKnight also testified that while serving as an FBSS caseworker, she visited mother's home, and she was concerned about the safety of the home. The home was being renovated and did not have running water. The condition of the home was not safe, and McKnight believed that it was dangerous for A.D. to be living in the home. McKnight had difficulty contacting mother about making additional visits to mother's home. McKnight noted that mother's boyfriend lived in the home with her.

McKnight further testified that although mother was supposed to be participating in the narcotics-use testing as a requirement of the FBSS program, mother failed to submit to testing. She was requested to take at least two random narcotics-use tests a month, and mother never gave McKnight a reason for her lack of participation. McKnight offered to help mother with transportation to her narcotics-use tests, but she did not get a response from mother. Before McKnight was the caseworker involved with mother's FBSS program, mother had tested positive for methamphetamine, cocaine, and amphetamine use.

---

resources that they need to help them overcome the issues for which DFPS has gotten involved in their lives. These services and resources include making regular visits to their homes; providing them with parenting classes, counseling, or drug treatment; and connecting them with resources in their community.").

4

McKnight explained that mother's participation in the FBSS program ended because mother stated that she was going to pick up A.D. from his assigned caregiver, and at the time, mother was not supposed to have unsupervised contact with A.D. Mother was also not engaging in the required services.

As to A.D.'s father, McKnight noted that mother wanted A.D. to be placed with father, but according to McKnight, DFPS had concerns with such an arrangement because of the difficulties it had in maintaining contact with father. When McKnight was involved as a caseworker, father did not participate in the required narcotics-use testing.

### DFPS Caseworker Padilla

DFPS caseworker Lesly Padilla testified that she was assigned to A.D.'s case from July 1, 2024 to November 11, 2024. While assigned to A.D.'s case, Padilla had trouble communicating with mother because mother did not have a telephone. When Padilla could not get ahold of mother, she would try to contact A.D.'s maternal grandmother and A.D.'s father to try and reach mother. During the case, Padilla was unable to get ahold of mother for an entire month, and she requested that law enforcement officers perform a welfare check at mother's home. Padilla also had trouble communicating with A.D.'s father.

As to the requirements of mother's Family Service Plan ("FSP"), Padilla testified that mother completed her psychosocial assessment on August 23, 2024,

but mother did not participate in other services. Mother did not attend all of her visits with A.D. during the pendency of the case. DFPS was willing to provide mother with transportation to her visits with A.D., but mother had to tell DFPS that she needed transportation in advance of her scheduled visit. Mother also failed to attend the required narcotics-use testing, which was supposed to occur twice a month. Mother did not provide an excuse for missing her narcotics-use testing. On October 16, 2024, when the trial court ordered mother to participate in a narcotics-use test within twenty-four hours, mother failed to comply with the trial court's order.[10]

As to mother's home, Padilla stated that she attempted to visit mother's home, but no one ever answered the door. Padilla looked through the windows of the home and was concerned because the home "was going through renovations." There was not much furniture inside the home and "a lot of pileage [sic] of objects on top of each other." From what Padilla could see, it did not appear to be a safe environment for A.D.

As to father, Padilla explained that he participated in DNA testing to determine A.D.'s parentage, but he did not complete any of the other requirements

---

[10]     A copy of the trial court's order was admitted into evidence. The trial court also ordered mother to submit to a narcotics-use test on April 9, 2025. A copy of that order was admitted into evidence as well.

of his FSP.[11]  Father participated in one narcotics-use test during the case, but he did not attend the other required ones.  Father did not attend all of his visits with A.D.  Padilla was able to visit father's home, which was clean but "very minimal."  If A.D. were placed in father's care, Padilla did not know who would take care of the child.  Father lacked consistent employment.

### *DFPS Caseworker Kaisharis*

DFPS caseworker Kristen Kaisharis testified that she was assigned to A.D.'s case on February 20, 2025.  While assigned to the case, Kaisharis visited mother's home.  According to Kaisharis, the home was dirty and cluttered; "[t]here was debris inside and outside of the home."  Around the home was broken glass and "junk."  The home did not have running water.[12]  In Kaisharis's opinion, the home was a danger to A.D.

Kaisharis also explained that mother lived with her boyfriend, and mother and her boyfriend had admitted that "two incidents of domestic violence" had occurred between them, one of which resulted in mother "be[ing] treated . . . medically."

As to the requirements of mother's FSP, Kaisharis stated that while she had been assigned to A.D.'s case, mother had not completed any of the requirements.

---

[11]     A copy of father's FSP was admitted into evidence.

[12]     Kaisharis noted that mother, at trial, testified that the "water issue ha[d] been resolved."

Mother's communication with Kaisharis had been inconsistent during the case, and mother was often unresponsive. In the two-and-a-half weeks prior to trial,[13] mother had become more communicative with Kaisharis about her services and visits. Mother had not requested transportation help from DFPS while Kaisharis was the caseworker.

Kaisharis further testified that during the pendency of the case, about a month before trial, mother was arrested for the offense of possession of a controlled substance.[14] This, coupled with the fact that mother had failed to participate in narcotics-use testing,[15] left Kaisharis concerned that A.D. would be "subject to an environment with drug use" if he were returned to mother's care.

Kaisharis also testified that mother had told Kaisharis that she had rekindled her relationship with A.D.'s maternal grandmother so she relied on the grandmother and her boyfriend for a support system. Mother had not had any visits with A.D.

---

[13]   Trial occurred in May 2025.

[14]   A copy of the complaint related to mother's charge was admitted into evidence. It alleged that on or about April 23, 2025, mother "intentionally and knowingly possess[ed] a controlled substance, namely [m]ethamphetamine, weighing more than 4 grams and less than 200 grams by aggregate weight, including any adulterants and dilutants." *See* TEX. HEALTH & SAFETY CODE ANN. §§ 481.102(6), 481.115(a), (d). After her arrest, mother was released on bond.

[15]   For instance, mother was asked to participate in narcotics-use testing on April 21, 2025 and April 29, 2025, and she did not show up for either test. As to the April 29, 2025 test, mother later told Kaisharis that she was in jail related to the possession-of-a-controlled-substance charge.

while Kaisharis was assigned to the case. Mother had a scheduled visit with A.D. for the following week.

As to father, Kaisharis testified that he had never expressed a desire to have A.D. placed with him, and he had been difficult to get in touch with during the case. Father had not had any visits with A.D. while Kaisharis had been assigned to A.D.'s case. Father had twice been previously convicted of the offense of aggravated robbery, and this concerned Kaisharis because "criminal activity [was] not a safe environment for a child of any age."[16] According to Kaisharis, father was on community supervision for a period of ten years. Kaisharis did not believe that father had demonstrated that he could take care of A.D.'s physical or emotional needs.

As to A.D.'s current placement, Kaisharis stated that A.D. "fe[lt] like that's his home." Kaisharis did not have any concerns about A.D.'s placement. A.D.'s foster mother wanted to adopt A.D., and Kaisharis believed it was in A.D.'s best interest to be adopted by his foster mother. A.D.'s foster mother provided him with

---

[16] Copies of two indictments were admitted into evidence. Both indictments alleged that, on or about June 3, 2015, A.D.'s father, "while in the course of committing theft of property owned by [the two complainants], and with intent to maintain control of the property, intentionally and knowingly threaten[ed] and place[d] [the complainants] in fear of imminent bodily injury and death, and [father] did then and there use and exhibit a deadly weapon, namely, a firearm." (Emphasis omitted.) Copies of two separate orders of deferred adjudication, dated March 2, 2017, were also admitted into evidence. They stated that father had pleaded guilty to two offenses of aggravated robbery and the trial court deferred adjudication of his guilt and placed him on community supervision for a period of ten years related to each offense.

a safe and stable home. While in his current placement, A.D., about every four to six weeks, had visits with his siblings who were in another placement. A.D. saw his siblings about two weeks before trial for "an Easter slash birthday party celebration." According to Kaisharis, mother had not demonstrated that she could take care of A.D.'s physical and emotional needs.

### CASA Volunteer Greer

Court Appointed Special Advocate ("CASA") volunteer Susan Greer testified that she had been assigned to A.D.'s case since the beginning. Greer did not have any concerns about A.D.'s current placement. A.D. was in a safe, stable, nurturing, and loving environment where he was happy, healthy, and well cared for. A.D. was placed with his maternal grandmother's friend, and the placement had arranged visits with his siblings during the case. A.D. had recently seen his siblings for an Easter celebration and to celebrate his older brother's birthday. A.D.'s foster mother was committed to continuing A.D.'s connection with his siblings. It was in A.D.'s best interest to stay in his current placement, and in Greer's opinion, it would be traumatic for him to be removed from his placement that had been nurturing and caring.

As to mother, Greer explained that she had observed mother's supervised visits with A.D. and mother played with the child during the visits. Because A.D.

had speech issues,[17] mother was encouraged by Greer to talk to A.D. more during her visits, but mother just stayed quiet. Mother did not reach out to Greer during the case to check on how A.D. was doing. Mother had not provided financial support for A.D. during the case.

Greer further testified that she had difficulty communicating with mother during the case because mother did not have a reliable telephone. In October 2024, Greer had spoken to mother about it being mother's responsibility to reach out to DFPS. Mother had become responsive within the last few weeks before trial.

Greer was concerned about mother's refusal to participate in narcotics-use testing during the case because mother had a history of narcotics use, and if she was not willing to be tested, it meant that "drugs might still be in the picture." Greer noted that she had offered to pick mother up and take her to her required narcotics-use testing.

Greer had visited mother's home twice during the case—most recently, about a week or two before trial. In August 2024 when Greer visited mother's home, the home was in disrepair. There was no running water and no electricity. It was not clean, and there was debris and clutter everywhere. When Greer was most recently at mother's home, she noted that there were no changes to the situation, other than

---

[17] Greer stated that when A.D. entered DFPS's care he was nonverbal and had "dental problems."

that the electricity was turned on. She did not believe that it was a safe environment for A.D. to be placed because the home was not clean, there was no place for A.D. to sleep, and there was still debris everywhere. There was also broken glass in the yard. Further, although there was a refrigerator in the home, the cabinets and "everything" in the kitchen had been "ripped out," and there was no faucet.

Greer did not believe that mother was able to provide for A.D.'s physical and emotional needs. Mother had not shown that she could provide A.D. with a safe and stable home given the incidents of domestic violence between mother and her boyfriend and mother's failure to participate in narcotics-use testing during the case. Greer believed it was in A.D.'s best interest for mother's parental rights to be terminated.

*Mother*

Mother testified that she was A.D.'s mother. A.D. was about a year and a half old when he entered DFPS's care. Mother described A.D. as energetic and explained that he loved music, to run around, and to be outside. While in her care, A.D. talked, but he had a speech delay. A.D. was not mistreated in mother's care, and he was well cared for. Mother testified that A.D. had not been hurt or hospitalized while in her care and he did not have any bruises or scratches on him when he was removed.

Mother explained that she had nine children that were older than A.D., and they were placed with their maternal grandmother; they did not live with mother.[18] Mother had last visited with A.D. at the end of April 2025, but prior to that, mother had not visited A.D. since Christmas 2024. Mother stated that at the end of 2024, she started missing visits with A.D. because she did not have transportation, and it was the end of her pregnancy with another child. She was "having a really rough time." Mother did not ask DFPS or Child Advocates, Inc. ("Child Advocates") to help her with her transportation to visits.

Mother further explained that A.D. entered DFPS's care based on allegations that mother's home was unsafe because of her boyfriend's "overdose." According to mother, although her home did not have running water at the time, she and A.D. were staying at a friend's property and not at the home. As to her boyfriend's overdose, mother stated she had not exposed A.D. to danger because she and A.D. were not present when the overdose occurred. Mother's boyfriend had not addressed any substance abuse issues during the case.

As to her living arrangements, mother testified that she still lived in the same home as when the case began. Mother agreed that DFPS was concerned about her home not having running water, and at the time a representative from Child

---

[18]   Mother noted that she had twelve children in total and none of them lived with her. Her oldest child was sixteen years old.

Advocates visited her home a week before trial, the water was still not turned on.[19] However, according to mother, at the time of trial, the water in her home had been reconnected and "the pipes ha[d] been fixed," so the home now had running water. Mother disagreed that her home did not have electricity when the case began.

Mother also testified that there were issues with clutter in the home, but she stated that the clutter was because she and her boyfriend were "doing renovations." Renovations to the home were needed because the house had been broken into and vandalized; the windows were "busted out," cabinets were broken, and "holes [were put] in some of the walls." Mother said the clutter would be gone when the renovations were complete, and she estimated that the house would be finished in about a month. Mother wanted to put up a fence.

According to mother, she lived with her boyfriend, and they had a good relationship. Her boyfriend had a close relationship with A.D., and he had raised A.D. since he was three months old. In the past, she had "domestic disputes" with her boyfriend, but A.D. was not present for those. Mother did not believe that her boyfriend was a danger to A.D.

Mother further testified that in 2024, she became pregnant and lost her job because her employer "didn't want to put [her] in hazards with the baby." Mother

---

[19] Mother stated that she and her boyfriend had "about six of the five gallon buckets" of water and anytime she needed to take a shower she went to her father-in-law's home next door.

14

had health issues while pregnant and was put on bedrest for a while. Mother had a daughter in January 2025, and she was removed from mother's care in February 2025.

As to her FSP, mother testified that she was ordered to complete certain requirements, and she had completed a "psych" assessment and a substance abuse assessment. Mother had not completed her counseling requirement. According to mother, she had her first counseling session scheduled for the week after trial.

Mother admitted that on April 23, 2025, during the pendency of this case, she was arrested for the offense of possession of a controlled substance, and at the time of trial, she was "out on bond" related to that charge. Mother also conceded that she tested positive for methamphetamine, cocaine, and amphetamine use in February 2024. Mother had not attended all of her required narcotics-use testing, but she stated it was because she did not "have any kind of way to communicate"; she did not have a telephone. Mother noted that she had been offered a ride to one of her required narcotics-use tests, but she did not need a ride that particular day.[20] When mother arrived at the testing location though, she did not have valid identification. Mother failed to attend narcotics-use testing on April 21, 2025 and April 29, 2025.

---

[20] Mother also noted that DFPS had offered her rides to court, to her visits with A.D., and to narcotics-use testing.

Mother stated that she wanted A.D. to be returned to her care, but she noted that she first needed to complete the requirements of her FSP. Mother explained that she was employed and doing better financially, but she agreed that A.D. could not be returned to her care immediately. Mother conceded that she had over a year to complete the requirements of her FSP but stated that she had been unable to complete the requirements because she did not have stable communication. Mother listed A.D.'s maternal grandmother as her support system.

Mother testified that she believed A.D. had been progressing normally while in his foster placement. At the time of trial, A.D. was placed with his maternal grandmother's friend, and the friend wanted to be his long-term caregiver. Mother did not think that it was in A.D.'s best interest to remain in his current placement because she believed that "he should be more close to his relatives -- to his siblings." Mother thought that A.D. should have more visits with his siblings. Mother denied that she had attempted to pick A.D. up from his foster placement and stated that she did not know where A.D.'s foster mother lived.

As to A.D.'s father, mother stated that she occasionally had contact with him and she did not have concerns about his parental abilities. At the time of trial, father lived in an apartment that mother believed was suitable for a child. Mother would be fine with A.D. being placed with his father, and father knew that mother wanted A.D. placed with him. Mother noted that father had never provided her with

16

financial support for A.D., and she did not know why father had not shown up for trial.

***Mother's FSP***

The trial court admitted into evidence a copy of mother's FSP dated June 27, 2024. As to "hopes and dreams" for A.D., the FSP stated that mother hoped that A.D. would be returned to her care and "to provide support and love for him as he gr[ew]." (Emphasis omitted.)

As to A.D., the FSP stated that, according to mother, he was "behind on shots" when he entered DFPS's care. A.D. had only met his siblings a few times because they lived with their maternal grandmother.[21]

Regarding herself, mother reported that she had been diagnosed with manic depression and "ha[d] episodes," with the last one being in February 2024. Mother had been prescribed medication for her depression, but she had not filled the prescription for a year because she had not seen a doctor. Mother wanted to start taking her medication again because it helped with her sobriety. According to mother, she had "relapsed [in 2024] on [m]eth."

Mother also reported that she lived alone in her boyfriend's trailer, where she paid for utilities but not rent. The trailer was located on her boyfriend's family's property. Mother wanted to get a place of her own.

---

[21] According to the FSP, nine of mother's children lived with her mother.

Mother's FSP required her to, among other things: obtain and maintain legal and verifiable employment and provide DFPS with supporting documentation; obtain and maintain appropriate housing;[22] not associate with known criminals or engage in criminal activity; submit to random narcotics-use testing;[23] complete a substance abuse assessment and follow its recommendations; participate in and complete individual therapy; complete a psychological evaluation and follow its recommendations; initiate monthly contact with DFPS caseworker; attend all visits with A.D.; provide age-appropriate clothing, diapers, and school supplies for A.D. during the case; and complete parenting classes.

***Foster Mother***

A.D.'s foster mother testified that A.D. had been living with her since February 22, 2024, and she wanted to adopt him. A.D.'s foster mother's fiancé, mother, and daughter also lived in the home. A.D.'s foster mother would be adopting A.D. as a single adult because she was not yet married.

As to a normal day with A.D., his foster mother explained that A.D. woke up between 9:30 a.m. and 10:00 a.m. and then had breakfast. After breakfast, he played

---

[22] This requirement informed mother that she could not reside in a home with anyone with a criminal history involving a felony crime, crime of moral turpitude, or violent crime. Mother also had to provide A.D. with a reasonable place to sleep and allow a DFPS caseworker to view the interior of the home.

[23] The FSP told mother that the failure to complete a narcotics-use test would result in a "presumed positive result for all illegal substances."

18

with his toys or sat with her on the couch and read books. She and A.D. also practiced flash cards, and A.D. played with his foster sister, who was one year old. Around 2:00 p.m., A.D. ate lunch. After lunch, until about 4:00 p.m. or 5:00 p.m., A.D. played with his toys and his foster sister, with whom he got along well.

A.D.'s foster mother also noted that A.D. attended a Mother's Day Out program twice a week so that he could interact with teachers and other children, which had helped with his previous speech issues. She described him as an "active little boy," who "jump[ed] everywhere," and she noted that A.D.'s speech issues had been resolved.

In regard to the care she provided to A.D., his foster mother explained that A.D. was her top priority, and she wanted "to make sure his mental health and his emotions [were] very well taken care of." She believed that she, her fiancé, and her family did a "fantastic job listening to [A.D.] when he[] [was] upset." They "t[ook] care of him," loved him, were patient with him, and "d[id] everything [they] c[ould] to make sure he kn[ew] what it[] [was] like to be loved." According to A.D.'s foster mother, they were a "very close-knit family" and did "everything together." She put her "children's mentality and emotions above everything else."

Since A.D. had been placed with his foster mother, he had had twelve visits with his siblings that his foster mother had organized with A.D.'s maternal grandmother. A.D. had visits with his siblings at the pool and attended celebrations

19

with his siblings. His siblings had also had overnight visits at his foster mother's home, and he had spent weekends with his siblings at his maternal grandmother's home. A.D.'s foster mother noted that she spoke to A.D.'s maternal grandmother about once a week about how A.D. was doing. It was important that A.D. maintained his sibling relationships, and his foster mother planned to continue visits with his siblings if she were able to adopt A.D.

According to his foster mother, A.D. did not have any medical or other special needs. He visited the pediatrician while in her care, and he was meeting his milestones. A.D. was thriving in his current placement.

A.D.'s foster mother knew mother and A.D.'s father, and she was concerned about his health and safety if he were returned to either of their care. A.D.'s foster mother was concerned because mother did not have custody of A.D.'s eleven siblings and she did not want A.D. "to go back to the same situation" he was in previously.

**Termination of Mother's Parental Rights**

In a portion of her first issue, mother argues that the trial court erred in terminating her parental rights to A.D. because the evidence is legally and factually insufficient to support the trial court's finding that she engaged, or knowingly placed A.D. with persons who engaged, in conduct that endangered his physical or emotional well-being. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(E). In her fourth

20

issue, mother argues that the trial court erred in terminating her parental rights to A.D. because the evidence is legally and factually insufficient to support the trial court's finding that termination of her parental rights was in the best interest of A.D. *See id.* § 161.001(b)(2).

A parent's right to "the companionship, care, custody, and management" of her child is a constitutional interest "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59 (1982) (internal quotations omitted). The United States Supreme Court has emphasized that "the interest of [a] parent[] in the care, custody, and control of [her] child[] . . . is perhaps the oldest of the fundamental liberty interests recognized by th[e] Court." *Troxel v. Granville*, 530 U.S. 57, 65 (2000). Likewise, the Texas Supreme Court has concluded that "[t]his natural parental right" is "essential," "a basic civil right of man," and "far more precious than property rights." *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985) (internal quotations omitted). Consequently, "[w]e strictly construe involuntary termination statutes in favor of the parent." *In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012).

Because termination of parental rights is "complete, final, irrevocable and divests for all time that natural right . . . , the evidence in support of termination must be clear and convincing before a court may involuntarily terminate a parent's rights." *Holick*, 685 S.W.2d at 20. Clear and convincing evidence is "the measure or degree

of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007; *see also In re J.F.C.*, 96 S.W.3d 256, 264 (Tex. 2002). Because the standard of proof is "clear and convincing evidence," the Texas Supreme Court has held that the traditional legal and factual standards of review are inadequate. *In re J.F.C.*, 96 S.W.3d at 264–68.

In conducting a legal-sufficiency review in a termination-of-parental-rights case, we must determine whether the evidence, viewed in the light most favorable to the finding, is such that the fact finder could reasonably have formed a firm belief or conviction about the truth of the matter on which DFPS bore the burden of proof. *Id.* at 266. In viewing the evidence in the light most favorable to the finding, we "must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so," and we "should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible." *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (internal quotations omitted). However, this does not mean that we must disregard all evidence that does not support the finding. *In re J.F.C.*, 96 S.W.3d at 266. Because of the heightened standard, we must also be mindful of any undisputed evidence contrary to the finding and consider that evidence in our analysis. *Id.* If we determine that no reasonable trier of fact could form a firm belief or conviction that the matter that must be proven is true, we

must hold the evidence to be legally insufficient and render judgment for the parent. *Id.*

In conducting a factual-sufficiency review in a termination-of-parental-rights case, we must determine whether, considering the entire record, including evidence both supporting and contradicting the finding, a fact finder reasonably could have formed a firm conviction or belief about the truth of the matter on which DFPS bore the burden of proof. *In re C.H.*, 89 S.W.3d 17, 25–26 (Tex. 2002). We should consider whether the disputed evidence is such that a reasonable fact finder could not have resolved the disputed evidence in favor of its finding. *In re J.F.C.*, 96 S.W.3d at 266. "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (internal quotations omitted).

In order to terminate the parent-child relationship, DFPS must establish, by clear and convincing evidence, one or more of the acts or omissions enumerated in Texas Family Code section 161.001(b)(1) and that termination of parental rights is in the best interest of the child. *See* TEX. FAM. CODE ANN. § 161.001(b). Both elements must be established, and termination may not be based solely on the best interest of the child as determined by the trier of fact. *See id.*; *Tex. Dep't of Human*

23

*Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). Notably though, "[o]nly one predicate finding under section 161.001[(b)](1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest." *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003).

## A. Endangerment

In a portion of her first issue, mother argues that the evidence is legally and factually insufficient to support the trial court's finding that she engaged, or knowingly placed A.D. with persons who engaged, in conduct that endangered his physical or emotional well-being because "no drug tests were entered into evidence," it was not "completely clear when mother tested positive for drugs, what substances she tested positive for, and what the levels were," "[t]here [was] no proof . . . that [m]other received a text alerting her to drug test and then just ignored it," mother had addressed almost all of the concerns about the condition of her home, and A.D. was not living in the home when mother's boyfriend overdosed.[24] *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(E).

A trial court may order termination of the parent-child relationship if it finds by clear and convincing evidence that a parent has "engaged in conduct or knowingly

---

[24] We do not address mother's assertions about her home and her boyfriend's overdose because even without considering such evidence, we hold that the evidence is legally and factually sufficient to support the trial court's finding that mother engaged, or knowingly placed A.D. with persons who engaged, in conduct that endangered his physical or emotional well-being. *See infra*.

placed the child with persons who engaged in conduct which endanger[ed] [his] physical or emotional well-being." *Id.* Within this context, endangerment encompasses "more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment." *Boyd*, 727 S.W.2d at 533. Instead, to "endanger" means to expose the child to loss or injury or to jeopardize his emotional or physical health. *Id.* (internal quotations omitted); *see also Walker v. Tex. Dep't of Fam. & Protective Servs.*, 312 S.W.3d 608, 616 (Tex. App.—Houston [1st Dist.] 2009, pet. denied).

We must look at a parent's conduct standing alone, including her actions and omissions. *In re J.W.*, 152 S.W.3d 200, 205 (Tex. App.—Dallas 2004, pet. denied). It is not necessary to establish that a parent intended to endanger the child. *See In re M.C.*, 917 S.W.2d 268, 270 (Tex. 1996); *In re L.M.N.*, No. 01-18-00413-CV, 2018 WL 5831672, at *14 (Tex. App.—Houston [1st Dist.] Nov. 8, 2018, pet. denied) (mem. op.). But termination of parental rights requires "more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required." *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.); *see also In re L.M.N.*, 2018 WL 5831672, at *14; *In re J.W.*, 152 S.W.3d at 205. The specific danger to the child's well-being may be inferred from parental misconduct, even if the conduct is not directed at the child and the child suffers no actual injury. *See Boyd*, 727 S.W.2d at 533; *In re L.M.N.*, 2018 WL 5831672, at

25

*14; *In re R.W.*, 129 S.W.3d 732, 738 (Tex. App.—Fort Worth 2004, pet. denied). Courts may consider parental conduct that did not occur in the child's presence, including conduct that occurred after the child was removed by DFPS. *In re L.M.N.*, 2018 WL 5831672, at *14; *In re A.A.M.*, 464 S.W.3d 421, 426 (Tex. App.—Houston [1st Dist.] 2015, no pet.).

A parent's narcotics use can qualify as a voluntary, deliberate, and conscious course of conduct that endangers the child's well-being. *In re D.J.G.*, No. 01-22-00870-CV, 2023 WL 3513143, at *12 (Tex. App.—Houston [1st Dist.] May 18, 2023, no pet.) (mem. op.); *In re T.S.*, No. 01-22-00054-CV, 2022 WL 4474277, at *30 (Tex. App.—Houston [1st Dist.] Sept. 27, 2022, no pet.) (mem. op.); *In re C.V.L.*, 591 S.W.3d 734, 751 (Tex. App.—Dallas 2019, pet. denied); *In re S.R.*, 452 S.W.3d 351, 361–62 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). And continued narcotics use after the child's removal from the parent's care is conduct that jeopardizes a parent's parental rights and may be considered as establishing an endangering course of conduct. *In re D.J.G.*, 2023 WL 3513143, at *12; *In re T.S.*, 2022 WL 4474277, at *30; *In re C.V.L.*, 591 S.W.3d at 751; *In re S.R.*, 452 S.W.3d at 361–62; *see also Cervantes-Peterson v. Tex. Dep't of Fam. & Protective Servs.*, 221 S.W.3d 244, 253 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (considering conduct jeopardizing parental rights as part of course of conduct endangering well-being of child). When "a parent engages in [narcotics] use during the pendency

26

of a [termination-of-parental-rights case], when [she] knows [she] is at risk of losing h[er] child[], the evidence is legally sufficient to support a [trial court's] finding of endangerment." *In re D.D.M.*, No. 01-18-01033-CV, 2019 WL 2939259, at \*4 (Tex. App.—Houston [1st Dist.] July 9, 2019, no pet.) (mem. op.); *see also In re D.J.G.*, 2023 WL 3513143, at \*12; *In re T.S.*, 2022 WL 4474277, at \*30; *In re R.S.*, No. 01-20-00126-CV, 2020 WL 4289978, at \*7 (Tex. App.—Houston [1st Dist.] July 28, 2020, no pet.) (mem. op.) ("Parental [narcotics] use remains endangering conduct even if the child was not in the parent's custody when the [narcotics] use occurred."); *In re A.M.*, 495 S.W.3d 573, 580 (Tex. App.—Houston [1st Dist.] 2016, pet. denied) ("Because the evidence showed that the [parent] engaged in illegal [narcotics] use during the pendency of the termination suit, when he knew he was at risk of losing his children, we hold that the evidence is legally sufficient to support a finding of endangerment."). Further, when the evidence shows that the parent engaged in narcotics use during the pendency of the termination-of-parental-rights case, and no evidence directly contradicts that, the evidence is factually sufficient to support the trial court's endangerment finding. *See In re D.J.G.*, 2023 WL 3513143, at \*12; *In re A.M.*, 495 S.W.3d at 580; *see also In re D.D.M.*, 2019 WL 2939259, at \*5.

Mother admitted that in February 2024 she tested positive for methamphetamine, cocaine, and amphetamine use. *See In re H.M.-W.J.*, No.

01-24-00396-CV, 2024 WL 4846848, at *15–16 (Tex. App.—Houston [1st Dist.] Nov. 21, 2024, pet. denied) (mem. op.) (considering parent admission he tested positive for narcotics-use in determining whether evidence sufficient to support trial court's finding parent engaged in endangering course of conduct). She also stated that she had only attended two of her required narcotics-use tests; mother admitted to not attending her required narcotics-use testing on April 21, 2025 and April 29, 2025. *See In re I.W.*, No. 14-15-00910-CV, 2016 WL 1533972, at *6 (Tex. App.—Houston [14th Dist.] Apr. 14, 2016, no pet.) (mem. op.) (parent's "refusal to submit to the drug test may be treated by the [fact finder] as if he had tested positive for drugs"); *see also In re C.A.B.*, 289 S.W.3d 874, 885 (Tex. App.—Houston [14th Dist.] 2009, no pet.) (fact finder could infer parent's failure to submit to court-ordered narcotics-use testing indicated she was avoiding testing because she was using narcotics).

Mother also conceded that on April 23, 2025, while this case was pending, she was arrested for the offense of possession of a controlled substance, and according to mother, at the time of trial, she was "out on bond" related to that charge. A copy of the complaint related to mother's criminal charge was admitted into evidence, and it alleged that on or about April 23, 2025, mother "intentionally and knowingly possess[ed] a controlled substance, namely [m]ethamphetamine, weighing more than 4 grams and less than 200 grams by aggregate weight, including

28

any adulterants and dilutants."[25] *See R. R. v. Tex. Dep't of Fam. & Protective Servs.*, No. 03-24-00435-CV, 2024 WL 4574360, at *9 (Tex. App.—Austin Oct. 25, 2024, no pet.) (mem. op.) (in holding evidence sufficient to support trial court's endangerment finding noting that, during pendency of case, mother was arrested for possession of controlled substance); *In re E.G.*, No. 02-14-00351-CV, 2015 WL 1262631, at *10 (Tex. App.—Fort Worth Mar. 19, 2015, no pet.) (mem. op.) (considering, while case pending, parent was charged with possession of controlled substance and was awaiting trial on that charge in determining whether evidence sufficient to support trial court's finding parent had engaged in conduct that endangered children's physical or emotional well-being).

Mother's FSP, a copy of which was admitted into evidence, stated that mother had reported to DFPS that she had "relapsed [in 2024] on [m]eth," and thus, mother's FSP required her to submit to a substance abuse assessment and participate in random narcotics-use testing while the case was pending. The FSP informed mother that if she failed to attend a narcotics-use test the result would be "a presumed positive result for all illegal substances."

Multiple DFPS caseworkers testified as to mother's failure to participate in narcotics-use testing during the pendency of the case. *See In re H.M.-W.J.*, 2024 WL 4846848, at *15–16 (considering parent's failure to attend all required

---

[25] *See* TEX. HEALTH & SAFETY CODE ANN. §§ 481.102(6), 481.115(a), (d).

29

narcotics-use testing while case pending in determining whether evidence sufficient to support trial court's finding parent engaged in endangering course of conduct); *In re W.E.C.*, 110 S.W.3d 231, 239 (Tex. App.—Fort Worth 2003, no pet.) (fact finder could reasonably infer parent's failure to complete scheduled narcotics-use screenings indicated she avoided testing because she had used narcotics); *see also In re D.J.G.*, 2023 WL 3513143, at *12–13 (parent's failure to submit to all required narcotics-use testing relevant to whether evidence was sufficient to support finding parent engaged in endangering course of conduct); *In re A.K.T.*, No. 01-18-00647-CV, 2018 WL 6423381, at *13 (Tex. App.—Houston [1st Dist.] Dec. 6, 2018, pet. denied) (mem. op.) (considering parent's failure to submit to narcotics-use testing during course of case when holding evidence legally and factually sufficient to support finding parent engaged in conduct that endangered child's physical and emotional well-being).

McKnight stated that while mother was part of the FBSS program, she did not submit to the required narcotics-use testing, and she was requested to take at least two tests a month. Mother never gave McKnight a reason for failing to attend the required tests, and McKnight offered to help mother with transportation to her

30

tests,[26] but mother did not respond. McKnight confirmed that mother had tested positive for methamphetamine, cocaine, and amphetamine use in the past.

Similarly, Padilla testified that mother was supposed to submit to two random narcotics-use tests per month, and mother failed to attend the required narcotics-use testing. Mother did not provide an excuse for missing the required tests. On October 16, 2024, during the case, the trial court ordered mother to submit to a narcotics-use test within twenty-four hours, and mother did not comply with the trial court's order.[27]

From the evidence admitted at trial, the trial court could have reasonably inferred that mother had engaged in narcotics use during the pendency of the termination-of-parental-rights case.[28]  *See In re H.M.-W.J.*, 2024 WL 4846848, at

---

[26] CASA volunteer Greer also testified that she offered to pick mother up and take her to her required narcotics-use testing, but mother did not take advantage of the offer. Mother also conceded at trial that DFPS had offered her rides to her narcotics-use testing.

[27] A copy of the trial court's order was admitted into evidence. The trial court also ordered mother to submit to a narcotics-use test on April 9, 2025. A copy of that order was admitted into evidence as well.

[28] We note that mother complains that DFPS did not admit into evidence at trial copies of her narcotics-use test results, but this is not required for the evidence to be legally and factually sufficient to support the finding by the trial court that mother engaged, or knowingly placed A.D. with persons who engaged, in conduct that endangered his physical or emotional well-being, based on her narcotics use. *See, e.g.*, *In re C.Y.*, No. 02-21-00261-CV, 2022 WL 500028, at *3–4 & n.8 (Tex. App.—Fort Worth Feb. 18, 2022, pet. denied) (mem. op.) (holding testimony about parent's illegal narcotics-use while termination case was pending was sufficient "to establish clear and convincing proof of voluntary, deliberate, and conscious conduct that endangered the well-being" of child and noting copies of narcotics-use testing

*16; *In re D.J.G.*, 2023 WL 3513143, at *13; *In re D.D.M.*, 2019 WL 2939259, at *4–5; *In re A.M.*, 495 S.W.3d at 580; *see also In re D.L.W.W.*, 617 S.W.3d 64, 78–79 (Tex. App.—Houston [1st Dist.] 2020, no pet.) ("[W]e have [previously] concluded that illegal narcotics use may support termination under Texas Family Code section 161.001(b)(1)(E)."); *In re N.J.H.*, 575 S.W.3d 822, 831–32 (Tex. App.—Houston [1st Dist.] 2018, pet. denied) ("[A] parent's decision to engage in illegal drug use during the pendency of a termination suit, when the parent is at risk of losing a child, may support a finding that the parent engaged in conduct that endangered the child's physical or emotional well-being." (alteration in original) (internal quotations omitted)).

Thus, viewing the evidence in the light most favorable to the trial court's finding, we conclude that the trial court could have formed a firm belief or conviction that mother engaged, or knowingly placed A.D. with persons who engaged, in conduct that endangered his physical or emotional well-being. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(E). And viewing the evidence in a neutral light, we conclude that a reasonable fact finder could have formed a firm belief or conviction that

---

results were not admitted into evidence at trial (internal quotations omitted)); *see also In re M.T.C.*, No. 04-16-00548-CV, 2017 WL 603634, at *2 (Tex. App.—San Antonio Feb. 15, 2017, no pet.) (mem. op.) ("[I]n parental-termination cases, the relevant inquiry is not the type of evidence, but whether the strength of the evidence satisfies the appropriate standard of review.").

mother engaged, or knowingly placed A.D. with persons who engaged, in conduct that endangered his physical or emotional well-being. *See id.*

Further, we conclude that the trial court could have reconciled any disputed evidence in favor of finding that mother engaged, or knowingly placed A.D. with persons who engaged, in conduct that endangered his physical or emotional well-being. *See id.* And any disputed evidence was not so significant that a fact finder could not have reasonably formed a firm belief or conviction that mother engaged, or knowingly placed A.D. with persons who engaged, in conduct that endangered his physical or emotional well-being. *See id.*

Accordingly, we hold that the evidence is legally and factually sufficient to support the trial court's finding that mother engaged, or knowingly placed A.D. with persons who engaged, in conduct that endangered his physical or emotional well-being. *See id.*

We overrule this portion of mother's first issue.

Having held that the evidence is legally and factually sufficient to support the trial court's finding that mother engaged, or knowingly placed A.D. with persons who engaged, in conduct that endangered his physical or emotional well-being, we need not address the remaining portion of mother's first issue or her second and third issues, in which she asserts that the evidence was legally and factually insufficient to support the trial court's findings that she knowingly placed, or knowingly allowed

33

A.D. to remain, in conditions or surroundings which endangered his physical or emotional well-being, she constructively abandoned A.D., who had been placed in the permanent or temporary conservatorship of DFPS for not less than six months, and she failed to comply with a court order that specifically established the actions necessary for her to obtain the return of A.D. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (N), (O); *In re A.V.*, 113 S.W.3d at 362 (only one predicate finding under Texas Family Code section 161.001(b)(1) necessary to support judgment of termination); *see also* TEX. R. APP. P. 47.1.

## B.    Best Interest

In her fourth issue, mother argues that the evidence is legally and factually insufficient to support the trial court's finding that termination of her parental rights was in the best interest of A.D. because "[a] review of the evidence in th[e] case under the *Holley* factors" does not support the trial court's finding. *See Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).

The best-interest analysis evaluates the best interest of the child. *See In re M.A.A.*, No. 01-20-00709-CV, 2021 WL 1134308, at \*20 (Tex. App.—Houston [1st Dist.] Mar. 25, 2021, no pet.) (mem. op.); *In re D.S.*, 333 S.W.3d 379, 384 (Tex. App.—Amarillo 2011, no pet.).  It is presumed that the prompt and permanent placement of a child in a safe environment is in his best interest. *See* TEX. FAM. CODE ANN. § 263.307(a); *In re D.S.*, 333 S.W.3d at 383.

There is also a strong presumption that the child's best interest is served by maintaining the parent-child relationship. *In re L.M.*, 104 S.W.3d 642, 647 (Tex. App.—Houston [1st Dist.] 2003, no pet.). Thus, we strictly scrutinize termination proceedings in favor of the parent. *See In re M.A.A.*, 2021 WL 1134308, at *20; *In re N.L.D.*, 412 S.W.3d 810, 822 (Tex. App.—Texarkana 2013, no pet.).

In determining whether the termination of mother's parental rights was in the best interest of A.D., we may consider several factors, including: (1) the desires of A.D.; (2) the current and future physical and emotional needs of A.D.; (3) the current and future emotional and physical danger to A.D.; (4) the parental abilities of the parties seeking custody of A.D.; (5) whether programs are available to assist those parties; (6) plans for A.D. by the parties seeking custody; (7) the stability of the proposed placement for A.D.; (8) mother's acts or omissions that may indicate that the parent-child relationship is not proper; and (9) any excuse for mother's acts or omissions.[29] *See Holley*, 544 S.W.2d at 371–72; *In re L.M.*, 104 S.W.3d at 647. We may also consider the statutory factors set forth in Texas Family Code section 263.307. *See* TEX. FAM. CODE ANN. § 263.307; *In re A.C.*, 560 S.W.3d 624, 631 n.29 (Tex. 2018); *In re C.A.G.*, No. 01-11-01094-CV, 2012 WL 2922544, at *6 & n.4 (Tex. App.—Houston [1st Dist.] June 12, 2012, no pet.) (mem. op.).

---

[29]  Much of the evidence discussed below applies to multiple factors.

We note that the above listed factors are not exhaustive, and DFPS need not prove all factors as a condition precedent to the termination of parental rights. *See In re C.H.*, 89 S.W.3d at 27; *see also In re C.L.C.*, 119 S.W.3d 382, 399 (Tex. App.—Tyler 2003, no pet.) ("[T]he best interest of the child does not require proof of any unique set of factors nor limit proof to any specific factors."). The absence of evidence about some of the factors does not preclude a fact finder from reasonably forming a strong conviction or belief that termination is in a child's best interest. *In re C.H.*, 89 S.W.3d at 27; *In re J. G. S.*, 574 S.W.3d 101, 122 (Tex. App.—Houston [1st Dist.] 2019, pet. denied). In some cases, undisputed evidence of only one factor may be sufficient to support a finding that termination is in a child's best interest. *See In re C.H.*, 89 S.W.3d at 27; *see also In re J. G. S.*, 574 S.W.3d at 122.

The same evidence of acts and omissions used to establish grounds for termination under Texas Family Code section 161.001(b)(1) may also be relevant to determining the best interest of the child. *See In re C.H.*, 89 S.W.3d at 28; *In re L.M.*, 104 S.W.3d at 647. The trial court is given wide latitude in determining the best interest of the child. *Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982); *see also Cuellar v. Flores*, 238 S.W.2d 991, 992 (Tex. App.—San Antonio 1951, no writ) (trial court "faces the parties and the witnesses, observes their demeanor and personality, and feels the forces, powers, and influences that cannot be discerned by merely reading the record").

### 1. A.D.'s Desires

When mother's parental rights were terminated, A.D. was almost three years old. Given his age, A.D. did not directly express a desire as to whether he wanted to return to mother's care or remain in his current placement.

When there is no specific evidence of a child's desire or a child is too young to express his desire, a fact finder may consider evidence that the child is bonded with his foster family and receiving good care in his current placement. *See In re L.W.*, No. 01-18-01025-CV, 2019 WL 1523124, at *18 (Tex. App.—Houston [1st Dist.] Apr. 9, 2019, pet. denied) (mem. op.); *In re L.M.N.*, 2018 WL 5831672, at *20.

A.D. had spent about half of his life in his current placement. DFPS caseworker Kaisharis testified that A.D. "fe[lt] like [his current placement was] his home." As discussed below, there is ample evidence that A.D. is thriving with his foster mother, his foster mother is attending to his needs, he is bonded with his foster family, and his foster mother wants to adopt him. *See In re L.W.*, 2019 WL 1523124, at *18 (in determining evidence sufficient to support best-interest finding, considering children bonded with foster family, foster parents wanted children to continue to live with them, and foster parents meeting children's needs); *see also In re L.M.N.*, 2018 WL 5831672, at *20 ("A child's bonding with her foster family implies that the child's desire would be fulfilled by adoption by the foster family.").

37

## 2.    Current and Future Physical and Emotional Danger

### a.    *Narcotics Use and Criminal Conduct*

Illegal narcotics use by a parent may constitute evidence of current and future danger to a child.  *See In re D.J.G.*, 2023 WL 3513143, at *23; *In re O.J.P.*, No. 01-21-00163-CV, 2021 WL 4269175, at *19–21 (Tex. App.—Houston [1st Dist.] Sept. 21, 2021, no pet.) (mem. op.) (considering evidence of parent's narcotics use in determining current and future danger to child); *see also In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009) (stating "a parent's use of narcotics and its effect on his or her ability to parent may qualify as an endangering course of conduct"); *In re S.R.H.*, No. 01-15-0714-CV, 2016 WL 430462, at *10–11 (Tex. App.—Houston [1st Dist.] Feb. 4, 2016, no pet.) (mem. op.) (parent's past narcotics use is indicative of instability in home environment); *Cervantes-Peterson*, 221 S.W.3d at 254–55 (illegal narcotics use while parental rights are in jeopardy may be considered endangering course of conduct critical to finding that termination is in child's best interest).

As detailed above related to mother's first issue, there is ample evidence that mother had a history of narcotics use.  We also note that she tested positive for narcotics use in February 2024 and failed to attend any required narcotics-use testing

38

while the case was pending.[30] *See In re Z.J.B.*, No. 14-18-00759-CV, 2019 WL 347474, at *7 (Tex. App.—Houston [14th Dist.] Jan. 29, 2019, pet. denied) (mem. op.) (parent's positive narcotics-use tests and failure to appear for other narcotics-use tests weighed in favor of trial court's best-interest finding); *In re I.W.*, 2016 WL 1533972, at *6 (parent's "refusal to submit to the drug test may be treated by the [fact finder] as if he had tested positive for drugs"); *In re W.E.C.*, 110 S.W.3d at 239 (fact finder could reasonably infer parent's failure to complete scheduled narcotics-use screenings indicated she avoided testing because she had used narcotics); *see also In re R.S.*, 2020 WL 4289978, at *7 ("Parental [narcotics] use remains endangering conduct even if the child was not in the parent's custody when the [narcotics] use occurred.").

Further, about a month before trial, mother was arrested for the offense of possession of a controlled substance. Mother was "out on bond" related to the charge at the time of trial. *See In re J.C.*, No. 01-25-00136-CV, 2025 WL 2109931, at *12 (Tex. App.—Houston [1st Dist.] July 29, 2025, no pet.) (mem. op.) ("[A] parent's unresolved criminal cases threaten her ability to maintain a stable home." (internal quotations omitted)); *In re J.C.*, No. 11-20-00006-CV, 2020 WL 3470395, at *2 (Tex. App.—Eastland June 25, 2020, no pet.) (mem. op.) (considering parent's

---

[30] Mother's FSP told her that if she missed a required narcotics-use test, it would be considered a positive result. Mother admitted that she missed her required testing on multiple occasions.

pending charge for possession of controlled substance in holding evidence sufficient to support trial court's best-interest finding); *In re J.N.*, No. 10-16-00234-CV, 2017 WL 730364, at *7 (Tex. App.—Waco Feb. 22, 2017, no pet.) (mem. op.) (parent's history, narcotics use, and "inability to maintain a lifestyle free from arrests and incarcerations are relevant to the best-interest determination"); *In re R.W.*, 129 S.W.3d at 739 ("As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of [the] child.").

Additionally, we note that A.D. was initially removed from mother's care after her boyfriend, with whom she was still in a relationship and living with, overdosed on narcotics. Mother agreed at trial that her boyfriend had not addressed any substance abuse issues during the case. *See In re L.W.*, 2019 WL 1523124, at *13 ("A parent endangers her children by accepting the endangering conduct of other people."); *see also In re K.S.*, 420 S.W.3d 852, 856 (Tex. App.—Texarkana 2014, no pet.) ("[The] past is [a] prologue[;] there is a great likelihood that [a parent's] conduct w[ill] continue into the future. Actions speak louder than words.").

### 3. Current and Future Physical and Emotional Needs, Parental Abilities, Plans for A.D., and Stability of Proposed Placement

#### a. *A.D.'s Specific Needs*

The record does not indicate that A.D. has any special needs. *See In re E.N.C.*, 384 S.W.3d at 808 (noting no evidence that children's needs differed from other

children). However, mother's FSP stated that when A.D. entered DFPS's care, he was "behind on [his] shots." Further, mother admitted that A.D. had a speech delay when he was in her care. According to CASA volunteer Greer, when A.D. entered DFPS's care, he was nonverbal and had "dental problems." Because of A.D.'s speech issues, mother was encouraged by Greer to talk to A.D. more during her visits with the child, but mother just stayed quiet. *See In re M.A.A.*, 2021 WL 1134308, at *23 (child's basic needs include medical and dental care); *see also* TEX. FAM. CODE ANN. § 263.307(b)(12)(A), (F) (in determining whether parent willing and able to provide child with safe environment, considering whether parent demonstrated adequate parenting skills, such as providing health care and understanding child's needs).

After A.D. was placed with his foster mother, she put him in a Mother's Day Out program twice a week so that he could interact with teachers and other children, which helped him with his speech issues. *See, e.g.*, *In re J.V.B.*, No. 01-17-00958-CV, 2018 WL 2727732, at *10 (Tex. App.—Houston [1st Dist.] June 7, 2018, pet. denied) (mem. op.) (considering child's foster parents were addressing child's speech delay while in their care). A.D.'s foster mother testified that A.D.'s speech issues had been addressed while in her care and he was meeting his milestones.

b.    *Mother's Stability*

A child's need for a safe and stable home is the paramount consideration in assessing the best interest of the child.  *See* TEX. FAM. CODE ANN. § 263.307(a) (prompt and permanent placement of child in safe environment presumed to be in child's best interest); *In re G.M.G.*, 444 S.W.3d 46, 60 (Tex. App.—Houston [14th Dist.] 2014, no pet.) (parent who lacks ability to provide child with safe and stable home is unable to provide for child's emotional and physical needs); *In re K.C.*, 219 S.W.3d 924, 931 (Tex. App.—Dallas 2007, no pet.); *Adams v. Tex. Dep't of Fam. & Protective Servs.*, 236 S.W.3d 271, 280 (Tex. App.—Houston [1st Dist.] 2007, no pet.) (in children's best interest to be raised in consistent, stable, and nurturing environment).

Mother agreed at trial that she was not ready for A.D. to be immediately returned to her care.  *See In re B.A.*, No. 01-25-00201-CV, 2025 WL 2646867, at *17 (Tex. App.—Houston [1st Dist.] Sept. 16, 2025, no pet.) (mem. op.) (noting parent acknowledged that she was not prepared for child to be immediately returned to her care); *see also In re I.L.G.*, 531 S.W.3d 346, 356 (Tex. App.—Houston [14th Dist.] 2017, pet. denied) (stability of proposed placement important consideration in determining whether termination of parental rights in children's best interest).  And, during trial, multiple witnesses expressed concern about mother's living arrangements.

42

DFPS caseworker McKnight stated that when she visited mother's home during the case, she was concerned about its safety. The home did not have running water, and the condition was not safe because it was in the process of being renovated. DFPS caseworker Padilla testified that when she visited mother's home, she could see through the windows that there was not much furniture inside the home and "a lot of pileage [sic] of objects on top of each other." Although Padilla could not go inside mother's home because no one answered the door, it did not appear to be a safe environment for A.D. given the renovations that were occurring.

Further, DFPS caseworker Kaisharis testified that she visited mother's home in 2025, and it was dirty and cluttered; "[t]here was debris inside and outside of the home." There was broken glass and "junk" outside of the home. The home did not have running water.

CASA volunteer Greer testified that, in August 2024, when she visited mother's home, the home was in disrepair. The home did not have running water or electricity. There was debris and clutter everywhere. Greer visited mother's home again about a week or two before trial, the home's condition remained unchanged, other than the electricity had been turned on. Greer did not believe that mother's home was a safe environment for A.D. because the home was not clean, there was no place for A.D. to sleep, and there was still debris everywhere. There was broken glass in the yard. The cabinets and "everything" in the kitchen had been "ripped

43

out," and there was no water faucet. *See* TEX. FAM. CODE ANN. § 263.307(b)(12)(D) (in determining whether parent willing and able to provide child with safe environment, considering whether parent demonstrates adequate parenting skills, such as ability to provide "a safe physical home environment"); *see, e.g.*, *In re K.S.O.B.*, No. 01-18-00860-CV, 2019 WL 1246348, at *21–23 (Tex. App.—Houston [1st Dist.] Mar. 19, 2019, no pet.) (mem. op.) (considering poor physical condition of parent's home in holding evidence sufficient to support trial court's best-interest finding).

As to the condition of her home, mother agreed that the week before trial, the water to her home was still not turned on. However, according to mother, at the time of trial, the water in her home had been reconnected and "the pipes ha[d] been fixed" so the home now had running water.[31] *See In re P.R.W.*, 493 S.W.3d 738, 744 (Tex. App.—Corpus Christi–Edinburg 2016, no pet.) (stating "even strong evidence of improvement cannot conclusively negate past history"); *Jordan v. Dossey*, 325 S.W.3d 700, 732 (Tex. App.—Houston [1st Dist.] 2010, pet denied) ("Although

---

[31]    Mother disagreed that her home did not have electricity when the case began. *See In re K.S.O.B.*, No. 01-18-00860-CV, 2019 WL 1246348, at *24 (Tex. App.—Houston [1st Dist.] Mar. 19, 2019, no pet.) (mem. op.) ("[T]o the extent that there are discrepancies in the record, the trial court, as the fact finder, is the sole judge of the credibility of the witnesses and the weight to give their testimony. . . . [T]he trial court may choose to believe one witness and disbelieve another. It is also free to disbelieve the testimony of any witness, and it may accept or reject all or part of a witness's testimony." (internal quotations and citations omitted)).

evidence shows [that parent] has made some recent improvements to her past situation, those improvements cannot absolve her of her long history of irresponsible choices.").

Mother also agreed that there were issues with clutter in her home, but she stated that it was because she and her boyfriend were "doing renovations" after the home had been broken into. Mother said the clutter would be gone when the renovations were complete and estimated that the house would be finished in about a month. *See In re K.S.O.B.*, 2019 WL 1246348, at \*24 (trial court "free to believe or disbelieve the testimony of any witness, and it may accept or reject all or part of a witness's testimony").

In addition to evidence of the condition of mother's home, the record contains evidence of domestic violence between mother and her boyfriend, with whom she was living at the time of trial. DFPS caseworker Kaisharis testified that mother and her boyfriend had admitted that "two incidents of domestic violence" had occurred between them, one of which resulted in mother "be[ing] treated . . . medically." Mother acknowledged that she had "domestic disputes" with her boyfriend but stated that she did not believe her boyfriend was a danger to A.D. because A.D. was not present for the domestic disputes. *See Boyd*, 727 S.W.2d at 533 (endangering acts need not be committed in child's presence, directed at child, or cause physical injury to child); *see also In re L.M.N.*, 2018 WL 5831672, at \*22 ("Evidence of violence

in the home supports a finding that the placement of a child with her parent is likely to subject the child to emotional and physical danger now and in the future.").

c.    *Current Placement*

DFPS caseworker Kaisharis testified that A.D. "fe[lt] like . . . home" in his current placement with his foster mother and his foster mother wanted to adopt him. *See In re T.M.R.*, No. 13-21-00144-CV, 2021 WL 4998438, at *7 (Tex. App.—Corpus Christi–Edinburg Oct. 28, 2021, no pet.) (mem. op.) ("A factfinder may consider the consequences of [the] failure to terminate parental rights and may also consider that the child's best interest may be served by termination so that adoption may occur."); *In re L.W.*, 2019 WL 1523124, at *23 (in holding evidence sufficient to support trial court's best-interest finding, considering children were placed in adoptive home with foster parents who wanted children to continue living with them). A.D.'s foster mother provided him with a safe and stable home and ensured that he had visits with his siblings to maintain those relationships.

Similarly, CASA volunteer Greer testified that A.D.'s foster placement was with his maternal grandmother's friend and she had arranged visits with A.D.'s siblings who were placed in his grandmother's care. A.D.'s placement was safe, stable, nurturing, and loving, and he was happy, healthy and well cared for. In Greer's opinion, it would be traumatic for A.D. to be removed from his current placement that had been nurturing and caring. *See In re J.M.*, 156 S.W.3d 696, 708

(Tex. App.—Dallas 2005, no pet.) (holding evidence sufficient to support trial court's finding termination of parental rights in child's best interest where "[t]he evidence show[ed] the foster parents' home [was] stable").

A.D.'s foster mother testified that A.D. had been living with her for about a year and a half and she wanted to adopt him. A.D.'s foster mother's fiancé, mother, and daughter were also living in the home. A.D.'s foster mother testified as to how A.D. spent his days in her home, and she noted that A.D. got along well with his foster sister, with whom he played often. Additionally, A.D. attended a Mother's Day Out program twice a week so that he could interact with teachers and other children, which had helped him with his speech issues. According to his foster mother, A.D.'s speech issues had been resolved. She described him as an "active little boy," who "jump[ed] everywhere."

Since A.D. had been placed with his foster mother, he had had twelve visits with his siblings that his foster mother had organized with A.D.'s maternal grandmother. A.D. had visits with his siblings at the pool and attended celebrations with his siblings. His siblings had also had overnight visits at his foster mother's home, and he had spent weekends with his siblings at his maternal grandmother's home. A.D.'s foster mother noted that she spoke to A.D.'s maternal grandmother about once a week about how A.D. was doing. A.D.'s foster mother agreed that it

was important that A.D. maintained his sibling relationships, and his foster mother planned to continue visits with his siblings if she was able to adopt A.D.

A.D.'s foster mother further explained that A.D. was her top priority, and she wanted "to make sure his mental health and his emotions [were] very well taken care of." She believed that she, her fiancé, and her family did a "fantastic job listening to [A.D.] when he[] [was] upset." They "t[ook] care of him," loved him, were patient with him, and "d[id] everything [they] c[ould] to make sure he kn[ew] what it[] [was] like to be loved." According to A.D.'s foster mother, they were a "very close-knit family" and did "everything together." She put her "children's mentality and emotions above everything else."

### 4. Mother's Acts and Omissions

A parent's failure to comply with her FSP supports a finding that termination of her parental rights is in the best interest of the child. *In re D.S.D.*, No. 01-24-00743-CV, 2025 WL 898322, at *22 (Tex. App.—Houston [1st Dist.] Mar. 25, 2025, pet. denied) (mem. op.); *see also In re J.-M.A.Y.*, Nos. 01-15-00469-CV, 01-15-00589-CV, 2015 WL 6755595, at *7 (Tex. App.—Houston [1st Dist.] Nov. 5, 2015, pet. denied) (mem. op.) ("[A] factfinder may infer from a parent's failure to take the initiative to complete the services required to regain possession of her children that she does not have the ability to motivate herself to seek out available resources needed now or in the future.").

The record is clear that mother did not complete all the requirements of her FSP, including failing to attend all of her visits with A.D. during the pendency of the case. *See In re J.H.*, No. 01-22-00629-CV, 2023 WL 2169952, at *18 (Tex. App.—Houston [1st Dist.] Feb. 23, 2023, pet. denied) (mem. op.) (considering parent either missed visits with child or was late to visits with child in determining whether evidence sufficient to support trial court's best-interest finding); *In re A.L.W.*, No. 01-14-00805-CV, 2015 WL 4262754, at *12 (Tex. App.—Houston [1st Dist.] July 14, 2015, no pet.) (mem. op.) (fact finder could infer from parent's failure to take initiative to complete services required to regain possession of her children that parent did not have ability to motivate herself to seek out available resources needed now or in future); *In re J.R.W.*, No. 14-12-00850-CV, 2013 WL 507325, at *8 (Tex. App.—Houston [14th Dist.] Feb. 12, 2013, pet. denied) (mem. op.) ("A parent's inconsistent visits may serve as an example of acts or omissions indicating that termination is in the child's best interest."). Although mother testified that she completed a "psych" assessment and a substance abuse assessment, requirements of her FSP, she did not complete all of the requirements.[32]  *See In re M.L.H.*, No.

---

[32]  As to excuses for mother's acts or omissions, we note that mother, in her briefing, references her difficult pregnancy during the pendency of the case.  We are not unsympathetic to the difficulties mother has faced, but the trial court was still entitled to find that mother's acts or omissions weighed in favor of termination of her parental rights. *See In re A.N.*, No. 02-14-00206-CV, 2014 WL 5791573, at *25 (Tex. App.—Fort Worth Nov. 6, 2024, no pet.) (mem. op.).

04-21-00408-CV, 2022 WL 526501, at *4 (Tex. App.—San Antonio Feb. 23, 2022, pet. denied) (mem. op.) (holding evidence legally and factually sufficient to support trial court's best-interest finding where parent "engaged in her service plan, [but] she failed to successfully complete it"); *In re E.A.F.*, 424 S.W.3d 742, 752 (Tex. App.—Houston [14th Dist.] 2014, pet. denied) (failure to comply with court-ordered service plan for reunification with the child relevant to best-interest finding); *cf. In re N.J.H.*, 575 S.W.3d at 835 (whether parent complied with FSP was proper consideration in best-interest analysis and parent's compliance with FSP weighed against termination).

For these reasons, viewing the evidence in the light most favorable to the trial court's finding, we conclude that the trial court could have formed a firm belief or conviction that termination of mother's parental rights was in the best interest of A.D. *See* TEX. FAM. CODE ANN. § 161.001(b)(2). Viewing the evidence in a neutral light, we conclude that a reasonable fact finder could have formed a firm belief or conviction that termination of mother's parental rights was in the best interest of A.D. *See id.* We further conclude that the trial court could have reconciled any disputed evidence in favor of finding that termination of mother's parental rights was in A.D.'s best interest, or any disputed evidence was not so significant that a fact finder could not have reasonably formed a firm belief or conviction that termination is in the best interest of A.D. *See id.*

Accordingly, we hold that the evidence is legally and factually sufficient to support the trial court's finding that termination of mother's parental rights was in the best interest of A.D.  *See id.*

We overrule mother's fourth issue.

**Possessory Conservatorship**

In her fifth issue, mother argues that the trial court erred in not appointing her as a possessory conservator of A.D., with supervised visitation rights, because mother did not significantly impair A.D.'s physical health and emotional development when he was in her care, parental access would not endanger A.D., and mother was an appropriate possessory conservator for her other children.

Generally, we review a trial court's conservatorship determination for an abuse of discretion. *In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007).  Importantly, an order terminating the parent-child relationship divests the parent of all legal rights and duties with respect to her child.  *See* TEX. FAM. CODE ANN. § 161.206(b); *In re A.L.J.*, No. 01-19-00251-CV, 2019 WL 4615826, at \*9 (Tex. App.—Houston [1st Dist.] Sept. 24, 2019, no pet.) (mem. op.).  A parent with no legal rights with respect to her child lacks standing to challenge the trial court's failure to appoint her a possessory conservator of the child.  *See In re D.D.D.*, No. 01-23-00078-CV, 2023 WL 4872399, at \*16–17 (Tex. App.—Houston [1st Dist.] Aug. 1, 2023, no pet.) (mem. op.); *In re D.J.G.*, 2023 WL 3513143, at \*28; *see also In re A.L.J.*, 2019 WL

51

4615826, at *9 (concluding because court had upheld termination of parent's parental rights, parent lacked standing to challenge portion of termination order naming DFPS as managing conservator).

Here, we have overruled mother's complaint that the trial court erred in terminating her parental rights to A.D. *See In re D.D.D.*, 2023 WL 4872399, at *17; *In re D.J.G.*, 2023 WL 3513143, at *28; *see also Quiroz v. Dep't of Fam. & Protective Servs.*, No. 01-08-00548-CV, 2009 WL 961935, at *11 (Tex. App.— Houston [1st Dist.] Apr. 9, 2009, no pet.) (mem. op.) (refusing to address parent's complaint evidence insufficient to support DFPS's appointment as sole managing conservator where evidence sufficient to support termination of parent's rights). Thus, the trial court's order terminating mother's parental rights divested her of her legal rights and duties to A.D. *See* Tex. Fam. Code Ann. § 161.206(b); *In re D.D.D.*, 2023 WL 4872399, at *17; *see also In re A.L.J.*, 2019 WL 4615826, at *9 ("Because we have overruled [parent's] challenge to the portion of the trial court's order terminating her parental rights, the order has divested [her] of her legal rights and duties related to [the children].").

Having no legal rights with respect to A.D., we hold that mother lacks standing to challenge the trial court's failure to appoint her as a possessory conservator of A.D. *See In re D.D.D.*, 2023 WL 4872399, at *17; *In re D.J.G.*, 2023 WL 3513143, at *28.

We overrule mother's fifth issue.

## Conclusion

We affirm the order of the trial court.


Kristin Guiney
Justice

Panel consists of Justices Guerra, Guiney, and Johnson.